# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | | |
|---|---|---|
| CHRISTOPHER REED, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:19-CV-385 (MTT) |
| | ) | |
| | ) | |
| GARY LONG, *et al.*, | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## ORDER

The Plaintiffs are sex offenders. That is because many years ago they committed offenses that fall within the State of Georgia's definition of sex offenses. Since then, they have served their terms of imprisonment and have, as far as the law is concerned, paid their debts to society. But because they have been classified as sex offenders, they remain subject to Georgia's lifelong requirement that they register with their local sheriff. But by all accounts, they are rehabilitated. They live productive, law-abiding lives. Two of the named Plaintiffs live with their parents; one has a six-year-old daughter living with him. The State of Georgia, under its system for classifying sex offenders, has not determined that they pose an increased risk of again committing a sexual offense.

Yet their Sheriff finds it necessary to post signs in front of their homes announcing to the public that their homes are dangerous for children. The Sheriff's decision is not based on any determination that the Plaintiffs are dangerous. Nor is the Sheriff's sign-posting founded on Georgia law. Rather, the Sheriff's decision is based

solely on the fact that the Plaintiffs' names remain on Georgia's registry of sex offenders. Further, Sheriff Long plans, as he has in the past, to ban the Plaintiffs from expressing their disagreement with the signs and the message the signs convey.

The Plaintiffs object and seek relief from this Court. The question the Court must answer is not whether Sheriff Long's plan is wise or moral, or whether it makes penological sense. Rather, the question is whether Sheriff Long's plan runs afoul of the First Amendment of the United States Constitution. It does.

## I. FACTUAL BACKGROUND

Plaintiffs Christopher Reed, Reginald Holden, and Corey McClendon bring this complaint individually and on behalf of a putative class of similarly situated persons against Butts County Sheriff Gary Long, Deputy Jeanette Riley, and Deputies John and/or Jane Does #1-3 for placing signs in front of their residences the week before October 31, or Halloween, 2018. Doc. 5 ¶¶ 1-3, 4-6, 11. After learning that the Defendants planned to post the same signs this Halloween, the Plaintiffs moved for a preliminary injunction[1] on October 7, and on October 24, the Court held a hearing on the motion.[2] Docs. 6; 12.

Reed, Holden, and McClendon were previously convicted of sexual offenses and are registered sex offenders. Docs. 5 ¶ 15-16, 22-23, 32-33; 11 ¶¶ 15-16, 22-23, 32-33.

---

[1] The motion does not specify whether the Plaintiffs are moving on behalf of themselves individually or on behalf of the proposed class. *See generally* Doc. 6. At the hearing, the Plaintiffs said they were moving on behalf of the entire class.

[2] Counsel for the Defendants informed the Court that the Spalding County Sheriff has been sued in the Northern District of Georgia because he, too, planned to place signs in front of sex offenders' homes. However, according to defense counsel, when the plaintiffs there moved for a preliminary injunction, the Spalding County Sheriff chose to not post signs this year and to allow the court to resolve the plaintiffs' claims.

Their offenses are among a wide range of offenses covered by a Georgia statute, O.C.G.A. § 42-1-12, imposing lifetime restrictions on "sex offenders." As discussed below, none of the named Plaintiffs have been determined by Georgia authorities to pose a heightened risk of recidivism. On the contrary, the evidence adduced at the hearing tends to establish that, having served their sentences, they have been rehabilitated and are leading productive lives.

Holden was convicted in 2004 in Florida of lewd and lascivious battery for an incident that occurred in 2001. Holden has owned a home in Butts County since May 2017. He lives by himself and works as a warehouse coordinator.

McClendon was convicted of statutory rape as the result of an incident that occurred in 2001 when he was seventeen. Specifically, he had sex with a female who was under the age of sixteen. McClendon is a full-time student, suffers from an unspecified disability, and lives with his parents, who own the home where he resides. His six-year-old daughter also lives with him.

Reed did not appear at the hearing because he could not take time off from work. According to the complaint, he was convicted of sexual assault in 2007 in Illinois. Doc. 5 ¶ 15-16. For the past six years, he has lived in Butts County with his father, who owns their home. *Id.*

Shortly before Halloween 2018, Butts County Sheriff's deputies placed in front of the Plaintiffs' homes signs carrying this message:



Doc. 12-11. The deputies also tacked to the front doors, or gave to the Plaintiffs, this leaflet:

Halloween Safety sign has been placed in front of your
residence by Order of Sheriff Gary Long. This order is due
to a registered Sex Offender is registered to be living at
this address with the Butts County Sheriff Office.

Ga Code Section 42-1-12 (i) provides as the duty of the
Sheriff Office

 The sheriff's office in each county shall:
    (5)Inform the public of the presence of sexual offenders
in each community

The sign will be placed at location by the Butts County
Sheriff Office on Saturday, October 27, 2018 and removed by
The Butts County Sheriff Office Before Sunday, November 4,
2018.

THIS SIGN IS PROPERTY OF THE BUTTS COUNTY SHERIFF OFFICE
SHERIFF GARY LONG, IT SHALL NOT BE REMOVED BY ANYONE OTHER
THAN THE BUTTS COUNTY SHERIFF OFFICE.

Doc. 12-4.

-4-

Holden found the sign when he returned home from work.  He telephoned Deputy Riley, whom he understood to be "the enforcement officer," to ask why the sign had been placed on his lawn without his knowledge or permission.  According to Holden, Deputy Riley informed him that if he removed the sign, he would be arrested. Holden also testified that shortly before Halloween 2017, a deputy came to his house and advised him to turn his lights off the night of Halloween and to not answer his door to anyone but law enforcement.  Holden did not object and complied with that restriction.

McClendon testified that two deputies appeared at his door shortly before Halloween 2018 to inform him that they would be "placing a sign on [his] property."  He also received a leaflet, presumably the one described above.  The deputies informed him that neither he nor anyone else could move the sign and that if he did, "it would be criminal action."  In response to his objections, one of the deputies informed him that "it had to be done."  McClendon understood that if he did not display the sign, he would "go to jail."

Reed's allegations track Holden's and McClendon's testimony.  He alleges that deputies placed the sign on his property on October 27, 2018, where it was noticed the next morning by his father when he left for church.  Doc. 5 ¶¶ 17-18.  Reed's father objected to the sign but was told by deputies that he had to display the sign.  *Id.* ¶¶ 19-20.

Sheriff Long testified that he plans to place identical signs in front of the residences of the fifty-seven registered sex offenders living in Butts County this year. He testified, and his attorney confirmed, that this is an "across the board placement of

-5-

signs," meaning that the signs will be placed without regard to the particular circumstances of a registrant's prior offense or any assessment of a registrant's threat to the community, specifically children.

Also, Sheriff Long generally confirmed Holden's testimony that prior to Halloween of 2018, deputies would do a "compliance check" shortly before Halloween and ask each registrant to place a leaflet on the door. Sheriff Long acknowledged that since he became sheriff in 2013, he has never had any problem with registrants having unauthorized contact with minors, or, for that matter, any problems at all with registrants living in Butts County. However, as he testified, and as the Facebook page of his re-election campaign states, the local chamber of commerce had canceled its annual community Halloween event in 2018.[3] Because that raised the possibility that more minors would be trick-or-treating, Deputy Riley asked if the Sheriff's Office could put warning signs in front of registrants' homes. Unsure of the answer, Sheriff Long had Deputy Riley contact the Georgia Sheriffs' Association for advice. Deputy Riley said she was told that they could post the signs if they were on the "right-of-way" and if they did not have on them the words "sex offender." In Sheriff Long's view, this is an "extension" of the sex offender registration requirements and his duties under § 42-1-12.

Sheriff Long testified that he plans to place the signs in what he understands to be the "rights-of-way" in front of registrants' homes. This year, like last year, residents and homeowners will not be allowed to move the signs, cover the signs, place something in front of the signs, or post a competing sign.

---

[3] There is no evidence that sex offenders were not allowed to attend the chamber of commerce event. Indeed, based on the evidence, none of the Plaintiffs are restricted from contact with minors.

Notwithstanding the absence of any specific information or data indicating that the Plaintiffs pose a risk, Sheriff Long strongly believes the signs are necessary. As he posted on his re-election campaign's Facebook page: "I am so ready for this fight. My staff and I will fight this to the end!!! Nothing is more important than our children!!!" Doc. 12-2.

## II. PRELIMINARY INJUNCTION STANDARD

A court may grant preliminary injunctive relief under Federal Rule of Civil Procedure 65(a) only "on notice to the adverse party." Once the adverse party is on notice, a court may grant preliminary injunctive relief only if the moving party establishes that: (1) "it has a substantial likelihood of success on the merits[;]" (2) it will suffer irreparable injury if the relief is not granted; (3) the threatened injury outweighs the harm the relief may inflict on the non-moving party; and (4) entry of relief "would not be adverse to the public interest." *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Svcs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005). The likelihood of success on the merits is ordinarily considered the most important factor. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). When the moving party has shown a substantial likelihood of success on the merits of a claim, the burden shifts to the nonmoving party to show that it is substantially likely to succeed on the merits of its affirmative defense, if it presents one. *See Gonzales v. O Centro Espirita Beneficente Unia do Vegetal*, 546 U.S. 418, 428-30 (2006) (holding that "the burdens at the preliminary injunction stage track the burdens at trial"). A court is authorized to grant the extreme relief of a preliminary injunction only when the high standards for such relief have been met. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (observing that

injunctive relief is "an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites").

## III.  DISCUSSION

### A.  Georgia Sex Offender Registry

The Defendants argue that they are appropriately exercising their authority under O.C.G.A. § 42-1-12(i)(5) when they place signs in front of registrants' homes.  Docs. 10 at 7-8, 11; 12-8.  Georgia's sex offender registration law, in its initial incarnation, was passed pursuant to the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act.  42 U.S.C. § 14071.  Since then, some states, including Georgia, have dramatically expanded the scope and restrictions of their sex offender registration schemes.  *See*, *e.g.*, *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019); *White v. Baker*, 696 F. Supp. 2d 1289, 1310 (N.D. Ga. 2010).

The Georgia law currently requires sex offenders to "[r]egister in person with the sheriff of the county in which the sexual offender resides within 72 hours after the sexual offender's release from prison or placement on parole, supervised release, probation or entry into this state" and then "[r]enew the required registration information with the sheriff of the county in which the sexual offender resides or sleeps by reporting in person to the sheriff within 72 hours prior to such offender's birthday each year[.]" O.C.G.A. § 42-1-12(f).

Significantly, the statute requires the Sexual Offender Registration Board to determine "risk assessment classifications" for registrants.  O.C.G.A. §§ 42-1-12, 42-1-13.  The highest risk classification is for "sexually dangerous predators," or those who are "at risk of perpetrating any future dangerous sexual offense."  O.C.G.A § 42-1-

12(a)(21).  A "Level I" risk assessment classification means "the sexual offender is a low sex offense risk and low recidivism risk for future sexual offenses."  O.C.G.A. § 42-1-12(a)(12).  A "Level II" risk assessment classification means the registrant is an intermediate sex offense risk and poses an intermediate recidivism risk.  O.C.G.A. § 42-1-12(a)(13).  According to the online Georgia Bureau of Investigation Sex Offender Registry, Reed is classified as a Level 1 sex offender, and Holden and McClendon are not leveled.  GEORGIA BUREAU OF INVESTIGATION SEX OFFENDER REGISTRY, http://state.sor.gbi.ga.gov/Sort_Public/SearchOffender.aspx (type [name] in "First/Last Name;" select "BUTTS" as "County;" click "Search;" then click [NAME]) (Oct. 27, 2019, 9:58 PM).

Section 42-1-12(i) requires county sheriffs to post a list of sex offenders residing in their respective counties.  The lists must be posted in the sheriff's office, all county administrative buildings, all municipal corporation administrative buildings, the superior court clerk's office, and on a website maintained by the sheriff; the sheriff may also "post the list of sexual offenders in any public building."  O.C.G.A. § 42-1-12(i).  This section goes on to broadly, and vaguely, state that sheriffs must "[i]nform the public of the presence of sexual offenders in each community."  O.C.G.A. § 42-1-12(i)(5).

The statute does not require or authorize sheriffs to post signs in front of sex offenders' homes, nor does it require sex offenders themselves to allow such signs.[4] *See generally* O.C.G.A. § 42-1-12.  Nor does the statute authorize a sheriff to place a

---

[4] Title 42, Chapter 1, Article 2 also does not forbid sex offenders from participating in Halloween festivities, such as trick-or-treating.  *See* O.C.G.A. §§ 42-1-15, 42-1-16, 42-1-17.

sign in front of a residence informing the public that the residence is unsafe.  *See generally id.*

### B. "Right-of-Way"

The Defendants argue that posting signs in front of the Plaintiffs' homes is proper because they will be placed in rights-of-way.  Doc. 15 at 3.  Sheriff Long and Deputy Riley testified at the hearing that they believe they can post the signs in rights-of-way because the Georgia Sheriffs' Association said they could.  In their supplemental brief, the Defendants also argue that as a citizen, Sheriff Long has a right to post signs in public rights-of-way.  Doc. 15 at 4-5.  However, the Defendants offer no evidence or authority to support the conclusion that Sheriff Long, either as the Sheriff or as a private citizen, has the right to place signs on rights-of-way in front of private residences.

In fact, Georgia law prohibits private citizens from placing signs in public rights-of-way.  O.C.G.A. § 32-6-51 prohibits signs in rights-of-way except as authorized by statute, local ordinance, or as required for the Georgia Department of Transportation to carry out its duties.  The parties do not address local law on the proper use of the rights-of-way,[5] but the Butts County Code defines a public right-of-way as a "strip of land designated, reserved, dedicated, or purchased for the purpose of pedestrian access, vehicular access, or utility line installation."  BUTTS CTY., GA. CODE OF ORDINANCES § 101-202.  Those uses concern travel and utility lines; they do not include a space for public announcements or signage.  *Id.*

---

[5] At the hearing, the parties gave considerable attention to whether or not the signs were placed in rights-of-way.  However, as the Court repeatedly noted at the hearing, Sheriff Long intends to place the signs in rights-of-way this Halloween, and whether they were placed in rights-of-way last year is not relevant to the Plaintiffs' claim for injunctive relief.  Rather, the only issue now is whether Sheriff Long may post the signs this year.

Thus, the assumption that rights-of-way grant unfettered public access is unfounded. "Property dedicated to a particular purpose cannot by the dedicatee, a municipality, be diverted from that purpose, except under the right of eminent domain." *Donalson v. Ga. Power & Light Co.*, 175 Ga. 462, 462, 165 S.E. 440, 443 (1932) (holding that a power company could not build over a public right-of-way easement); *see Faulkner v. Ga. Power Co.*, 243 Ga. 649, 650, 256 S.E.2d 339, 340 (1979) (allowing utility lines as a "customary" use of public right-of-way but affirming the rule that change in the type of use of a public right-of-way is a taking of the private landowner's underlying fee); *Smith v. City of Rome*, 19 Ga. 89, 91 (1855) (reversing a lower court's denial of an injunction against the local government's quarrying of rocks from the right-of-way).

Further, the Defendants' short, conclusory statement that the First Amendment protects their speech on public rights-of-way is perplexing in light of Sheriff Long's contention that it is illegal for the Plaintiffs to post objecting signs. The Defendants' First Amendment argument, if correct,[6] would apply equally to the Plaintiffs. In fact, the Plaintiffs, because their residences abut the rights-of-way, have rights in the rights-of-way superior to those of the general public. *See Seaboard Air Line Ry. Co. v. Greenfield*, 160 Ga. 407, 407, 128 S.E. 430, 435 (1925) (holding that when an abutting owner holds the base fee of the right-of-way, the owner "retains the exclusive right in

---

[6] Although the parties have not adequately briefed this issue, the Court doubts the merits of the Defendants' First Amendment argument. Statutes and ordinances which, like Georgia's, prohibit all signs on certain parts of government land have been found consistent with the First Amendment. *See, e.g., Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 791 (1984). On the other hand, if the Defendants were to proffer an interpretation of the statute allowing some speech in rights-of-way (like the Sheriff's signs), but not other forms of speech (like the Plaintiffs' speech), that could raise constitutional issues. *See Reed v. Town of Gilbert, Ariz.*, __ U.S. __, 135 S. Ct. 2218, 2230 (2015). But the Defendants do not discuss the statute at all, so those issues are not before the Court.

the land for every purpose or use which is not inconsistent with the public easement"); 1 PINDAR'S GA. REAL ESTATE LAW & PROCEDURE § 5:17 (Thomson Reuters, 7th ed. 2016) ("The owner of land abutting a road, street or highway occupies a special status as compared with members of the traveling public generally.").

In sum, the Defendants have not cited any evidence or authority indicating that they may use the right-of-way in front of the Plaintiffs' homes for their speech. And, when the Defendants place signs in front of registrants' homes, the fact that the signs are in rights-of-way, rather than a few feet closer to the homes, does not alter the First Amendment issues raised by the posting of the signs and the ban on any response by the Plaintiffs to the signs. On the contrary, the Defendants' "extension" of O.C.G.A. § 42-1-12 to justify posting signs declaring a home unsafe in front of the home likely raises substantial issues beyond the First Amendment.[7]

## C. Substantial Likelihood of Success on the Merits

### 1. Compelled Government Speech

The Plaintiffs argue that their First Amendment rights were violated when the Defendants placed the signs in front of their homes and forbade them from moving the signs or placing any contradicting or competing message near the signs. Doc. 6 at 6-12. The First Amendment "forbids abridgement of the freedom of speech," and "freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, __ U.S.

---

[7] For the reasons discussed at the hearing, the Court declines to enjoin the Defendants based on the Plaintiffs' state law trespass claim and Fifth Amendment unlawful taking claim. By way of summary, both claims are premised on the alleged fact that the signs were and will be posted on the Plaintiffs' property and outside the rights-of-way. However, it is undisputed that if signs are posted this Halloween, they will be posted on rights-of-way. Given this stipulated fact, there is not a substantial likelihood that the Plaintiffs' trespass claim and Fifth Amendment claim, as pled, will succeed.

__, 138 S. Ct. 2448, 2463 (2018) (quotation marks and citations omitted). "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Even when speech is purely factual with no ideological implications, it is still speech protected by the First Amendment, and the compelled speech doctrine applies. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 797-98 (1988) (holding that "cases cannot be distinguished simply because they involve[] compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech").

The Plaintiffs rely heavily on Judge Watkins's decision in *Doe 1 v. Marshall*. That is understandable; if *Doe 1 v. Marshall* was correctly decided, then the Plaintiffs clearly are entitled to injunctive relief. In *Doe 1 v. Marshall*, Judge Watkins held that an Alabama statute requiring the words "CRIMINAL SEX OFFENDER" on sex offenders' driver's licenses impermissibly compelled speech in violation of the First Amendment. 367 F. Supp. 3d at 1325. Judge Watkins reasoned that because the plaintiffs were required by law to carry their licenses and present them to the public, the licenses and language on them constituted (1) speech (2) that was compelled (3) and objected to and (4) that was readily associated with the plaintiffs. *Id.* That, Judge Watkins held, satisfied the compelled speech test. *Id.*

The Defendants recognize that Judge Watkins's compelled speech analysis, if followed by this Court, leads inevitably to the conclusion that the Plaintiffs are likely to succeed on their First Amendment claim. Indeed, if anything, the facts here—a sign on a front lawn declaring a home unsafe and a ban preventing the resident from doing

anything about it—present a more compelling case than the facts of *Doe 1 v. Marshall*. Recognizing this, the Defendants argue Judge Watkins wrongly decided *Doe 1 v. Marshall*. Specifically, they argue that the fourth element of the test applied by Judge Watkins—that the speech in question is readily associated with the Plaintiffs—was incorrect. Doc. 15 at 4 n.2. As applied by Judge Watkins, the Defendants say, "readily associated" equated to a determination that the speech was simply "about" the Plaintiffs. *Id.* at 10. The question, the Defendants say, is not merely whether the speech in question is about the Plaintiffs, but rather whether the circumstances suggest that the Plaintiffs "appear to endorse" the speech. *Id.*

As a part of this argument, the Defendants contend, as did the defendants in *Doe 1 v. Marshall*, that the signs are pure government speech and are thus not subject to the First Amendment. *Compare id.* at 1324 *with* Doc. 10 at 5. They contend the "Sheriff's signs, no matter where they are placed, do not force any plaintiff *personally* to endorse or express any belief or message." Doc. 15 at 7 (emphasis in original). They even argue that the Plaintiffs "are free to disagree vehemently. Plaintiffs remain free to believe or peacefully express the opposite message." *Id.*

As to their first point, all agree that the signs, in isolation, are government speech. As to their factual point—that the Plaintiffs' speech has not been restricted— it's not clear from where the Defendants retrieved these facts. But it is clear they are not the facts in this case. By their own admission, the Defendants plan to restrict the Plaintiffs' speech if allowed to post the signs this Halloween. The bottom line is this— regardless of whether Judge Watkins articulated the compelled speech "test" with

precision satisfactory to the Defendants, the facts here demonstrate that the Plaintiffs are likely to succeed on their First Amendment claims.

In support of their government speech argument, the Defendants cite *Pleasant Grove City v. Summum*, where the Supreme Court held that a local government could refuse to erect a monument donated by a private party because "government speech is not restricted by the Free Speech Clause." 555 U.S. 460, 469 (2009). The Court stated that "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech, but this case does not present such a situation," because "[p]ermanent monuments displayed on *public property* typically represent government speech." *Id.* at 470 (emphasis added). The Defendants also rely on *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, where the Court held that license plates constituted government speech and were thus not subject to the First Amendment because (1) "the history of license plates shows that . . . they have long communicated messages from the States;" (2) a person who displays a message on a plate "likely intends to convey that the State has endorsed that message," and if not, they could place their preferred message on a bumper sticker; and (3) "license plates are not traditional forums for public speech." __ U.S. __, 135 S. Ct. 2239, 2243-44, 2248-50 (2015) (punctuation and citations omitted). Furthermore, Texas law allowed the Texas Department of Motor Vehicles Board to "'refuse to create a new specialty license plate . . . if the design might be offensive to the public,'" and, like the city government in *Summum*, Texas "effectively controlled" the message by exercising its "final approval authority." *Id.* at 2244-45, 2247 (quotation marks and citations omitted).

Again, the Court agrees, in part, with the Defendants. The signs here are, indeed, government speech, but the Supreme Court has never said that government speech cannot also be, or can't become, compelled speech. On the contrary, in *Wooley v. Maynard*, the Supreme Court held that New Hampshire could not require drivers of passenger vehicles to put a license plate, which was considered government property, on their car with the state motto, "Live Free or Die," which was government speech. 430 U.S. at 715. The Supreme Court held that "a state measure which forces an individual, as part of his daily life—indeed constantly while his automobile is in public view—to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable," violated the First Amendment. *Id.* Simply put, the fact that the signs start as government speech does not mean that they are somehow immune to a compelled speech analysis. Whether government speech has become compelled speech in violation of the First Amendment turns on whether, based on the facts of the case, the government speech appeared to be endorsed by, adopted by, or, again, depending on the facts, whether the speech is sufficiently associated with a plaintiff. Examination of the facts here demonstrates that the Plaintiffs are likely to prevail on the merits.

First, Sheriff Long's speech is not at all like the government's speech in the cases cited by the Defendants because those cases do not involve speech compelled by the government; they involve the opposite. In *Summum* and *Walker*, citizens wanted the government to place *their* speech on government property that the government controlled and that was "linked to the [government's] identity." *Summum*, 555 U.S. at 473-74; *Walker*, 135 S. Ct. at 2246. If the Defendants mean to argue that the location

of the speech has some significance, as it did in *Summum* in particular, the Court agrees. Indeed, that is a critical point here. Sheriff Long, without any authority, wants to put his speech in front of the Plaintiffs' homes, which are obviously linked to their identifies, not the Sheriff's. He plans, in his speech, to level accusations at the Plaintiffs and he plans to ban the Plaintiffs from responding to his accusations.

Front yards, particularly that part of the yard closest to the road, *i.e.*, the right-of-way, are traditionally used as forums for residents' speech; they are not traditional forums for government speech. Someone who displays, or allows the display of, a sign in front of their home likely intends to convey that the message is endorsed by them, or allowed by them, or, at the very least, that they have acquiesced in the message. By requiring the Plaintiffs to display these signs, Sheriff Long and his deputies are requiring the Plaintiffs to effectively endorse or adopt, or at least acquiesce in, *his* message, not theirs, because the only message Sheriff Long will allow is his. Thus, the Plaintiffs are compelled to adopt that message and are compelled to allow it to be displayed in their front yards. And unlike the plaintiffs in *Walker*, who had the option of placing bumper stickers with their desired message on their cars, the Plaintiffs are forbidden by the Defendants from placing a competing message and are not "free to disassociate [themselves] from those views. . . ." Doc. 15 at 9 (quotation marks and citation omitted).

There is another point to be made. Sheriff Long plans to announce to the public that the Plaintiffs' homes are unsafe for children. The public undoubtedly will assume that Sheriff Long's determination is correct and, just as undoubtedly, the public assume that this determination is based on some process that yielded a conclusion that, in fact, the Plaintiffs' homes are unsafe. Yet that is not at all what will happen here. There has

been no process available to the Plaintiffs to contest Sheriff Long's determination that

their homes are unsafe. Even after the signs are placed, Sheriff Long has made clear

that he will punish (by arrest according to the Plaintiffs, by some unspecified means

according to Sheriff Long) the Plaintiffs if they remove the signs or seek to convey,

through signs of their own, their disagreement with Sheriff Long's determination. Again,

the Plaintiffs are effectively compelled to acknowledge to the public that their homes are

not safe.

In sum, the Defendants plan to compel the Plaintiffs to promote Sheriff Long's

speech. These facts are sufficient to demonstrate that the Plaintiffs are substantially

likely to show that the Defendants will burden the Plaintiffs' First Amendment rights.

### 2. Compelling Interest and Least Restrictive Means

To justify the burden on the Plaintiffs' First Amendment rights, the Defendants

must show (1) the compelled speech and their restrictions promote a compelling

government interest and (2) only the least restrictive means to further that interest were

used.[8] *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989); *Pac. Gas &*

*Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 19 (1986).

The Defendants argue they have a compelling interest in protecting children from

sex offenders. They no doubt do. *Smith v. Doe*, 538 U.S. 84, 93 (2003) (holding that

registry statutes were enforceable civil regulatory enactments designed to protect the

public and thus had a "legitimate nonpunitive governmental objective") (citation omitted);

*Rainer v. State*, 286 Ga. 675, 678, 690 S.E.2d 827, 829 (2010) (stating that § 42-1-12

advances "the State's legitimate goal of informing the public for purposes of protecting

---

[8] Aside from a vague reference in oral argument at the hearing, the Defendants have not argued, and
certainly have no authority, that a different showing is appropriate.

children from those who would harm them" (emphasis added)); *White*, 696 F. Supp. 2d at 1312. It is difficult to see, however, how that interest was the true motivation for the placement of the signs. As discussed, none of the registrants were targeted because of any particular or specific information that they posed a risk to children, other than the mere fact that they were registrants. Nevertheless, for the sake of determining the appropriateness of injunctive relief, the Court assumes that the protection of children has played some role in the plan to post signs.

The question then is whether the Defendants used the least restrictive means of furthering that interest, or, in other words, whether the signs were a narrowly tailored means of serving that interest. *Pac. Gas & Elec. Co.*, 475 U.S at 19. But the Defendants offer little, if anything, to support their argument that their accusatory signs are the least restrictive means furthering that interest. *See generally* Docs. 10; 15. Sheriff Long himself talked about less restrictive means he has used in the past to enhance child safety on Halloween. These means have not been shown to be ineffective. On the contrary, the absence of evidence of criminal activity by registrants suggests that less restrictive means have been entirely effective. Further, the Defendants' Facebook posts show that they can serve that interest through means that would not violate the Plaintiffs' First Amendment rights.[9] *See* Docs. 12-2; 12-8. Accordingly, the Court finds "no substantially relevant correlation between the governmental interest asserted and [the Defendants'] effort to compel [the Plaintiffs to post the signs]." *Pac. Gas & Elec. Co.*, 475 U.S at 19.

---

[9] Sheriff Long noted that some areas of Butts County have poor internet service, but it is safe to assume that parents have cell phones.

Because the Plaintiffs have established, at this stage, that there is a substantial likelihood that their First Amendment rights will be infringed and that the Defendants did not employ the least restrictive means of informing the public of the Plaintiffs' residences, there is a substantial likelihood that the Defendants will violate the Plaintiffs' First Amendment rights. The Plaintiffs have thus established the first—and most important—element of the preliminary injunction analysis.

**D. Irreparable Injury, Injury Outweighs the Harm, and Public Interest**

A violation of a constitutional right does not always amount to irreparable harm. *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (citations omitted). However, "[t]he Supreme Court has held that any loss of First Amendment freedoms, even for a brief amount of time, is sufficient to constitute the irreparable injury necessary to justify the issuance of a[n] injunction." *Univ. Books & Videos, Inc. v. Metro. Dade Cty.*, 33 F. Supp. 2d 1364, 1373 (S.D. Fla.1999) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Ne. Fla. Chapter of Assoc. of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir.1990)). The Plaintiffs have established that they are substantially likely to succeed on the merits of their First Amendment claim, and thus placement of the signs, even for a few hours of trick-or-treating, will constitute an irreparable injury.

Additionally, the Defendants argue that not posting the signs would significantly increase the costs of protecting the children of Butts County on Halloween. Deputy Riley testified at the hearing that it took her more than eight hours last year to travel throughout the County and post the signs in front of sex offenders' homes. Sheriff Long testified that in lieu of posting the signs, the Sheriff's Office would have to spend more

than $10,000 to pay deputies to patrol the sex offenders' homes on Halloween.  But the Defendants have provided no evidence that sex offenders residing in Butts County after their convictions have posed any safety risk to children in the past.  Again, Sheriff Long testified that for as long as he has served as the Sheriff, he cannot recall a time when there has been an issue with sex offenders on Halloween.  And again, the Defendants have effectively addressed this issue in previous years, and they offer no reason why they cannot use those same methods this year, other than the speculation that there may be more trick-or-treaters out.  Based on the evidence provided, the signs serve no legitimate safety function, and posting them would actually increase the costs and burdens of the Defendants while infringing on the Plaintiffs' constitutional rights.

Finally, the Defendants argued at the hearing that the public interest was served by allowing them to post the signs to protect the children trick-or-treating in Butts County.  Neither the Court nor anyone else would disagree that children's safety on Halloween is in the public interest.  But, again, the Defendants have provided no evidence showing that the Plaintiffs have posed or will pose any threat to children trick-or-treating on Halloween, and Holden and McClendon testified that they planned to shut off their lights and not answer the door on Halloween, just as they have in years past.  On the other hand, the public interest always is served when citizens' constitutional rights are protected, including sex offenders'.  "Sex offenders are not second-class citizens.  The Constitution protects their liberty and dignity just as it protects everyone else's."  *Doe 1*, 367 F. Supp. 3d at 1318.

### E. Laches

The Defendants argue that the doctrine of laches bars a preliminary injunction. Doc. 10 at 14. To establish this defense, the Defendants must prove a delay in filing the motion, that the delay was not excusable, and that it caused undue prejudice. *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1347 (11th Cir. 1996) (citation omitted). The Defendants claim that the date of the filing, September 24, 2019, and the date of the motion for an injunction, October 7, 2019, are later than was necessary and are the result of delay. Doc. 10 at 14. They produce no evidence, apart from that chronology, of delay.[10] Nor have the Defendants shown prejudice.

The Plaintiffs' counsel responded by stating that he learned of the case at a late date (after January 2019), surveyed the sex offenders, and filed a petition as quickly as possible. He claimed there was not a delay. The Court accepts the Plaintiffs' counsel's representations as accurate.

### IV. CONCLUSION

For the reasons stated above, the *named* Plaintiffs' motion to enjoin Sheriff Long and his deputies from placing the signs in front of their homes during this Halloween season is granted. To be clear, this injunction in no way limits Sheriff Long's discretion to act on specific information suggesting a risk to public safety. But he cannot post the

---

[10] The Defendants' laches argument perhaps finds some support in the fact that the Plaintiffs' attorneys were late to Court the day of the hearing on their motion for a preliminary injunction. When the Court asked if they were confused about the time for the hearing, one of the attorneys, seemingly nonplussed by the Court's question, responded that they were in the lobby of the courthouse at 9:27 for the 9:30 hearing. Ours is a small courthouse, though grand in its way, and the first floor lobby is not too far from the second floor main courtroom, but, still, the Court in turn was surprised that anyone could think that being timely anywhere within the curtilage of the courthouse could be considered a timely appearance for a judicial proceeding. In this judge's experience, both as a judge and a lawyer, he has never seen a proceeding convened in a courthouse lobby.

signs over the named Plaintiffs' objections simply because their names are on the registry.

The Plaintiffs' request for injunctive relief on behalf of the entire putative class presents a different question. As discussed, the determination of the Plaintiffs' rights is dependent upon the Plaintiffs' objection to and disagreement with Sheriff Long's message that their homes are unsafe. Although, as a practical matter, it might be assumed that anyone would object to such a message from law enforcement in front of their homes, the Court is not comfortable making that assumption as a foundation for injunctive relief. Moreover, different circumstances could exist with regard to particular registrants. For example, according to the registry, at least one registrant has been classified as a sexual predator. GEORGIA BUREAU OF INVESTIGATION SEX OFFENDER REGISTRY, http://state.sor.gbi.ga.gov/Sort_Public/SearchOffender.aspx (select "Sexually Dangerous Predators" under "Offender Type;" select "BUTTS" as "County;" click "Search;" then click "WILLIAM LEONARD WOODS JR") (Oct. 27, 2019, PM). The Court thus declines to enter an injunction in favor of putative class members. However, the Defendants should be aware that the authority for their blanket sign posting is dubious at best and even more dubious if posted over the objection of registrants.

The Defendants have requested the Court to enforce a bond if it enters an injunction. Docs. 10 at 14-15; 15 at 19-20. Pursuant to Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Defendants argue that the Court should enforce a bond requirement strictly, in part because the Third Circuit

has "'has interpreted the bond requirement very strictly.'"[11]  Doc. 10 at 15 (quoting

*Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir.1990)).  "[I]t is well-

established that the amount of security required by the rule is a matter within the

discretion of the trial court, and the court may elect to require no security at all."

*BellSouth Telecomms., Inc.*, 425 F.3d at 971 (punctuation and citation omitted).  And

even the Third Circuit has "acknowledged . . . that there may be instances in which a

strict reading of Rule 65(c) would be inappropriate."  *Temple Univ. v. White*, 941 F.2d

201, 219 (3d Cir. 1991).  In considering when bond is appropriate, the First Circuit has

articulated factors courts consider in deciding whether to require an injunction bond.

*Crowley v. Local No. 82, Furniture & Piano*, 679 F.2d 978, 1000 (1st Cir.1982), *rev'd on

other grounds*, 467 U.S. 526 (1984).  Those factors are: possible loss to the enjoined

party, the hardship a bond requirement would pose on the movant, and whether a bond

requirement might hinder the enforcement of constitutional rights.[12]  *Id.*; *White*, 941 F.2d

at 220.

 As previously stated, Sheriff Long testified that it would cost more than $10,000

to pay deputies to patrol *all* registrants' homes on Halloween during the traditional hours

of trick-or-treating.  However, the Defendants have offered no *specific* evidence of how

much it would cost to have the deputies at three individual homes.  And, again, the

Defendants have provided no evidence that Butts County registrants have posed any

safety risk to children in the past.  The Defendants have effectively addressed this issue

in previous years, and those same methods could be used this year, but the Defendants

---

[11] The Defendants do not cite Eleventh Circuit law on this subject.  *See generally* Docs. 10; 15.

[12] These factors are for noncommercial injunctions.  A bond is typically required when a court enjoins a commercial, money-making activity.  *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 297 F.R.D. 633, 634 (N.D. Ala. 2014).

have offered no evidence of the costs to employ those methods.  Furthermore, at least one Plaintiff has stated he cannot afford to help his parents with rent.  Those factors also work against an injunction.  "A number of appellate courts have waived security by indigent plaintiffs, as have several district courts in this Circuit."  *Badri v. Mobile Hous. Bd.*, 2011 WL 3665340, at *7 (S.D. Ala. Aug. 22, 2011) (footnotes omitted) (citing cases).  Further, the Plaintiffs seek to enforce First Amendment rights.  For these reasons, the Court finds it appropriate to require no bond for this injunction.

Accordingly, the Plaintiffs' motion for a preliminary injunction (Doc. 6) is **GRANTED in part** to the extent outlined in this Order.

**SO ORDERED**, this 29th day of October, 2019.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT
