IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| CHRISTOPHER REED, *et al.*, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| Plaintiffs, | ) | |
| | ) | 5:19-CV-00385-MTT |
| vs. | ) | |
| | ) | |
| GARY LONG, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants and, pursuant to the Local Rules file this Brief in Support of their *Motion for Summary Judgment*:

## BRIEF OVERVIEW OF FACTS[1]

### Background

This case arises out of placement of warning signs by the Butts County Sheriff's Office in Halloween 2018. Here is the sign:



Doc. 12-11; Doc. 20 (transcript) at 43.

The sign has the same message on both sides, and measures approximately two (2) feet by 18 inches. Doc. 20 (transcript) at 70. The Sheriff's Office intention was to place signs in public right-of-way areas adjacent to Plaintiffs' residences. See Doc. 20 (transcript) at 73-76; Riley Declaration at

---

[1] The facts set forth here are supported by record citations in Defendants' Statement of Material Facts, filed herewith.

¶4.

## Plaintiffs

Plaintiff Reginald Holden is a registered sex offender who owns a residence in Butts County. Doc. 20 (transcript) at 9-11. Mr. Holden's residence fronts a county-maintained roadway. Doc. 20 (transcript) at 18-19. Real estate records and measurements establish that the government's right-of-way extends well past the paved roadway and onto the grassy area in front of Mr. Holden's residence. Doc. 20 (transcript) at 92; Docs. 12-13, 12-18, 12-19, 12-20 (50-foot right of way); Riley Declaration at ¶6 & Exhibit marked BCSO scene photos – 12.

Plaintiff Corey McClendon is a registered sex offender who lives with his parents, who own the home where he resides. Doc. 17 at 3. The McClendon residence is adjacent to a county-maintained roadway. Doc. 20 (transcript) at 35. Real estate records and measurements establish that an 80-foot right-of-way extends well past the paved roadway and past the mailbox area of the residence. Doc. 20 (transcript) at 36, 72-73, 93; Docs. 12-21, 12-22, 12-23; Riley Declaration at ¶8 & Exhibit marked BCSO scene photos – 50.

Plaintiff Christopher Reed is a registered sex offender who lives with his father, who owns the residence. Doc. 5 ¶¶15-16. The Reed residence is adjacent to a county-maintained roadway. Doc. 20 (transcript) at 80; Doc. 12-12. Real estate records establish that a 60-foot right-of-way extends past the paved roadway and past the mailbox that serves the residence. Docs. 12-15, 12-16, 12-17. In 2018, a Sheriff's Office sign was placed within the right-of-way in an area in front of the Reed residence. Doc. 20 (transcript) at 80; Riley Declaration at ¶7 & Exhibit marked BCSO scene photos – 35.

## Historical Context and Reason for the Signs

Sheriff Gary Long is the elected Sheriff of Butts County, Georgia. Doc. 20 (transcript) at 38. The Sheriff's Office is the law enforcement entity responsible for implementing sex offender

registry and warning laws in Butts County. Doc. 20 (transcript) at 50. For many years before 2018, the Butts County Chamber of Commerce had an event known as "Halloween on the Square." Doc. 20 (transcript) at 38. This involved thousands of children trick-or-treating in a central location. Doc. 20 (transcript) at 38. As a result, not many children went trick-or-treating from house to house on Halloween. *Id*.

In 2018, the local Chamber of Commerce ended "Halloween on the Square." Doc. 20 (transcript) at 39. Therefore, the Sheriff's Office anticipated that far more children would be trick-or-treating from house to house for Halloween in 2018. Doc. 20 (transcript) at 39. A large portion of Butts County is rural. Doc. 20 (transcript) at 41. The Sheriff's Office anticipated families from outside their own neighborhoods, and perhaps from outside the county, visiting local neighborhoods to take children trick-or-treating. *Id*.

Halloween was the only occasion where the Sheriff's Office anticipated significant numbers of children visiting the residences of strangers in local neighborhoods. Doc. 20 (transcript) at 61. To warn trick-or-treating children and their parents about the presence and specific locations of sex offenders in the community, the Sheriff's Office decided to post warning signs temporarily in front of sex offender residences for Halloween. Doc. 20 (transcript) at 39, 46. The Sheriff's Office Facebook page included a post about the signs, indicating the signs had been placed in front of sex offender residences to notify the public to avoid the residence. Doc. 20 (transcript) at 62 & Doc. 12-8.

Before implementing the plan, the Sheriff's Office sought advice from the Georgia Sheriff's Association. Doc. 20 (transcript) at 39-41. The Georgia Prosecuting Attorney's Council advised, through the Sheriff's Association, that warning signs could be placed in the public right-of-way if they did not say "sex offender." Doc. 20 (transcript) at 40-41.

**Placement of Halloween Signs**

Deputy Jeanette Riley is the sex offender registration compliance officer for the Butts County Sheriff's Office. Doc. 20 (transcript) at 68. In 2018, Deputy Riley was involved with posting signs before Halloween in 2018. Doc. 20 (transcript) at 70. Defendant Scott Crumley assisted Riley, and that was his only role regarding the signs. Crumley Dep. at 13, 20, 23, 29. Crumley did not plan or supervise any aspect of the sign project. *Id*.

In 2018, the Butts County Sheriff's Office placed a sign in front of each Plaintiff's residence. Doc. 20 (transcript) at 13, 80.

Deputy Riley placed the signs in the right-of-way in front of sex offender residences in 2018. Doc. 20 (transcript) at 70-71. Deputy Riley normally used the mailbox as a guide for the distance of sign placement from the paved roadway. Doc. 20 (transcript) at 72-73. Defendants explained that the intention for 2019 was to place signs solely in the right-of-way adjacent to sex offender residences, as was done in 2018. Doc. 20 (transcript) at 75, 77, 84.

**Prohibition on Interference with Signs**

In 2018, the Sheriff's Office provided a written notice to Plaintiffs about the signs as follows:

> Halloween Safety sign has been placed in front of your residence by Order of Sheriff Gary Long. This order is due to a registered Sex Offender is registered [*sic*] to be living at this address with the Butts County Sheriff Office.

> Ga Code Section 42-1-12 (i) provides as the duty of the Sheriff Office [*sic*]

> The sheriff's office in each county shall:  (5)  Inform the public of the presence of sexual offenders in each community

> The sign will be placed at location by the Butts County Sheriff Office on Saturday, October 27, 2018 and removed by The Butts County Sheriff Office Before Sunday, November 4, 2018.

> HIS SIGN IS PROPERTY OF THE BUTTS COUNTY SHERIFF OFFICE

SHERIFF GARY LONG, IT SHALL NOT BE REMOVED BY ANYONE
OTHER THAN THE BUTTS COUNTY SHERIFF OFFICE.

Doc. 12-4 (Plaintiff Exhibit 1) (punctuation and capitalization in original).

The Sheriff's Office did not have any incident involving someone trying to take down a Halloween warning sign. Doc. 20 (transcript) at 89. Deputy Riley denies Mr. Holden's claim that, in 2018, she indicated that he would be arrested if he took down the sign. Doc. 20 (transcript) at 83. Rather, Deputy Riley told Mr. Holden that the sign was property of the Butts County Sheriff's Office and should not be removed from the right-of-way. Doc. 20 (transcript) at 83.

Georgia law prohibits private citizens from posting signs on government rights-of-way. O.C.G.A. § 32-6-51; Doc. 20 (transcript) at 87. The Sheriff's Office has no policy about persons posting signs on their own property, and has never had a plan to prohibit the lawful display of signs on private property. Declaration of Sheriff Long at ¶4.

## Other Government Usages of Right-of-Way Areas

Government signs commonly are placed on right-of-way areas in Butts County. Doc. 20 (transcript) at 48, 87. These include public safety signs, notices, traffic control signs and speed monitoring devices. Doc. 20 (transcript) at 48-49, 87, 90.

## Alternatives to Warning Signs

Sex offender lists exist at the Sheriff's Office, the clerk's office, local schools and some other government buildings, and also online. Doc. 20 (transcript) at 41-42. Sex offender lists normally show a name, an address and the offense. Doc. 20 (transcript) at 42. Some persons in Butts County lack internet service and/or vehicles. Doc. 20 (transcript) at 42. Therefore, Sheriff Long decided to post the signs to warn the public. *Id*.

To warn parents and children about specific sex offender residences, the Sheriff's

Office's alternative to posting the signs would involve posting a deputy in front of sex offender residences during Halloween. Doc. 20 (transcript) at 44. The expense to the Sheriff's Office for that type of operation would exceed $10,000. Doc. 20 (transcript) at 44-45. Furthermore, the Sheriff's Office does not have enough staff to cover 57 sex offender residences, and officers posted at those locations would be unavailable to carry out other law enforcement functions. Doc. 20 (transcript) at 44.

<u>ARGUMENT AND CITATIONS TO AUTHORITY</u>

The Amended Complaint raises a First Amendment "compelled speech" claim, as well as trespass claims under state law and a federal "takings" claims. Defendants respectfully submit they are entitled to summary judgment on all claims.

I.    ELEVENTH AMENDMENT IMMUNITY BARS PLAINTIFFS' MONEY DAMAGES CLAIMS AGAINST OFFICIAL CAPACITY DEFEDANTS

"The Eleventh Circuit has held that a sheriff is an "arm of the State" in establishing jail force policy, training, and discipline." *King v. King*, No. 5:17-CV-24 (MTT), 2017 WL 4018857, at *4 (M.D. Ga. 2017) (citing *Manders v. Lee*, 338 F.3d 1304, 1328 (11th Cir. 2003)(*en banc*)). "District courts deciding the issue have determined that a sheriff and employees performing law enforcement functions act as an "arm of the state," not the county." *Id.* (citing cases relating to non-jail functions). The Court in *King* dismissed the plaintiff's First Amendment claims based on Eleventh Amendment immunity. This case requires the same result, particularly since it involves the Sheriff's implementation of the State's sex offender notification mandate. See O.C.G.A. § 42-1-12 (i)(5) (requiring sheriffs to "Inform the public of the presence of sexual offenders in each community."). The Eleventh Amendment bars Plaintiffs' damages claims against Sheriff Long in his official capacity. The same is true to the extent Plaintiff intended to present

duplicative "official capacity" claims against Defendants Riley and Crumley. *Scruggs v. Lee*, 256 F. App'x 229, 232 (11th Cir. 2007).

## II.    QUALIFIED IMMUNITY PROTECTS DEFENDANTS FROM PLAINTIFFS' FEDERAL CLAIMS

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011) (emphases supplied; quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Since Defendants are sued for undertaking their law enforcement functions, they acted within their discretionary authority,[2] Plaintiffs bear the "the burden ... to show that [Defendants are] not entitled to qualified immunity." *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir.2003). Plaintiffs must show that the law was so well settled at the time of the operative acts, that each Defendant had fair and clear warning *"that his [or her] conduct was unlawful in the situation [each] confronted."* *Saucier v. Katz*, 533 U.S. at 202, 121 S.Ct. 2151, 2156 (2001) (emphasis supplied); *Cottone*, 326 F.3d at 1358. To meet their burden, Plaintiffs must show that "existing precedent … placed the statutory or constitutional question ***beyond debate***." *Stanton v. Sims*, 134 S.Ct. 3, 5 (2013) (emphasis added); *Reichle v. Howards*, 132 S.Ct. 2088, 2089 (2012) (same standard).

In section III and IV below, Defendants show that Plaintiffs' specific federal claims lack merit, and at least rest on such doubtful principles that government officers had no clear notice that they would violate federal law by placing these signs. Put differently, fundamental constitutional questions in this case are unsettled, and plainly "debatable." There is no legal authority that established any Defendant's conduct as clearly illegal under federal law.

---

[2]    *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1262 n.33 (11th Cir.2010) (discussing qualified immunity discretionary authority element).

Additionally, Defendants relied upon legal information provided by a presumptively competent attorney.[3] Therefore, qualified immunity bars individual money damages claims against Sheriff Long, Deputy Riley and Deputy Crumley.

## III.  PLAINTIFFS' FIRST AMENDMENT CLAIM FAILS

### A.  Plaintiffs Have No Right to Exclude Signs On Rights-of-Way

Plaintiffs McClendon and Reed do not claim to own real property, so they have no arguable standing to assert any claim that turns on a real property interest. Doc. 5 at ¶¶16, 33 (parent(s) own property, not Reed or McClendon); *see Coffin v. Barbaree,* 214 Ga. 149, 151, 103 S.E.2d 557 (1958) (" 'To maintain an action for trespass or injury to realty, it is essential that the plaintiff show either that he was the true owner or was in possession at the time of the trespass.' [Cits.]"); *Moses v. Traton Corp.*, 286 Ga. App. 843, 844, 650 S.E.2d 353, 355 (2007) (homeowner's trespass claim was barred because he did not own right-of-way area in "his" front yard).

Plaintiffs' lack of legal control over right-of-way areas matters to their First Amendment claim because Plaintiffs have no First Amendment right to control messages posted on a third party's property. As discussed in the next section, that is doubly true when the challenged message is government speech posted on government property. *See United Veterans Mem'l & Patriotic Ass'n of the City of New Rochelle v. City of New Rochelle*, 615 Fed.Appx. 693 (2d Cir.2015) (rejecting First Amendment challenge and holding that the flags hung on a flagpole on public property were government speech).

---

[3]    *See Wadkins v. Arnold*, 214 F.3d 535, 542-43 (4th Cir. 2000) (granting qualified immunity where detective acted on prosecutor's authorization in applying for the warrants); *V–1 Oil Co. v. Wyoming*, 902 F.2d 1482 (10th Cir.1990) (granting qualified immunity where officers acted on legal advice); *Arnsberg v. United States*, 757 F.2d 971, 982 (9th Cir. 1985) ("Counsel's advice would prevent a reasonable person from knowing that Arnsberg's constitutional rights were being violated." )

**B.    The Signs Convey Pure Government Speech That Is Not Subject to First Amendment Regulation**

The Sheriff's Office signs are not subject to Plaintiffs' First Amendment challenge because they convey only government speech. Drawing from the Supreme Court decisions in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 135 S.Ct. 2239, 2245 (2015), and *Pleasant Grove City v. Summum,* 555 U.S. 460, 470, 129 S.Ct. 1125, 1132 (2009), the Eleventh Circuit considers "[1] history, [2] endorsement, and [3] control" to test whether a message falls into the "government speech" category. *Mech v. Sch. Bd. of Palm Beach Cty., Fla.*, 806 F.3d 1070, 1075 (11th Cir. 2015). If so, then there is no First Amendment ground to interfere with the government's speech. *Id.* "Whether speech is government speech is inevitably a context specific inquiry." *Id.*

The record establishes that the signs convey only government speech. First, in regard to history, the testimony establishes a history of the Sheriff's Office posting its own signs in the Halloween time frame warning the public, specifically the same signs that it intended to post for Halloween 2019. No Plaintiff, and no private party, was involved in choosing the content or posting a sign.

Second, in regard to endorsement, the test is whether "observers reasonably believe the government has endorsed the message." *Mech*, 806 F.3d 1076. Here, the sign on its face is endorsed by, and attributable to, Sheriff Long. Every reader has to conclude that Sheriff Long endorsed the sign. By contrast, the signs bear no hint of endorsement by any Plaintiff.

Third, in regard to "the government's control over the message," *Mech*, 806 F.3d at 1078, the Sheriff's Office controlled the message, locations and timing of sign placement. Importantly, the signs are intended to be placed on government property, which distinguishes this case from

cases where a government insisted on displaying its message on private property.[4]  Everything about these signs evidences government control rather than speech subject to First Amendment regulation.

It follows that the signs are "government speech," and consequently "Plaintiffs' claim under the First Amendment fails." *Mech*, 806 F.3d at 1079. For First Amendment purposes, there is no difference between sex offender information posted in a government building, on a government web site, or on a sign placed on government right-of-way.

To be sure, government speech can also be "compelled speech." See Doc. 17 at 16.[5] Previously the Court distinguished this case from *Walker* and *Summum* because the plaintiffs in those cases sought to compel the government to convey the plaintiffs' messages. However, that distinction does not hold water, because here Plaintiffs also want to control the Sheriff's message. Specifically, Plaintiffs want completely *to prevent* Sheriff Long from posting his message via the signs. Plaintiffs demand one of the *worst* forms of interference with speech—no speech at all.

In sum, the signs convey "government speech" that is not subject to interference on First Amendment grounds. *Mech v. Sch. Bd. of Palm Beach Cty., Fla.*, 806 F.3d 1070, 1079 (11th Cir. 2015).

## C.  Defendants' Speech Rights Are Entitled to Protection

There can be no serious dispute that the federal constitution protects Defendants' right to send messages, including the subject signs. *See Mulligan v. Nichols*, 835 F.3d 983, 990 (9th Cir.

---

[4]  For example, the issue in *Wooley v. Maynard*, was "whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it *on his private property* in a manner and for the express purpose that it be observed and read by the public." *Wooley v. Maynard*, 430 U.S. 705, 713, 97 S. Ct. 1428, 1434–35 (1977) (emphasis supplied).

[5]  The compelled speech analysis is considered in detail below.

2016) ("It is well established that public employees and officials retain rights to free speech."). Defendants' right to speak is particularly acute when the message touches on matters of public concern and safety. *See Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 1689 (1983) ("speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.").

Defendants' speech rights are no less weighty than those asserted by the Plaintiffs. Defendants respectfully submit that federal law, including the government speech doctrine and the First Amendment, protects their right to post their own speech on public property, particularly where there is no objection from the public entity that owns the right-of-way. While Plaintiffs primarily object to the *location* of the signs adjacent to sex offender residences, that location is crucial to the effectiveness of the warning provided by the signs. *See Galvin v. Hay*, 374 F.3d 739, 756 (9th Cir. 2004) (explaining First Amendment protection of right to expression in particular area if "that expression depends in whole or part on the chosen location."). Each sign references a residence, and that message makes no sense if there is no residence nearby.

Federal law broadly guarantees Defendants the right to send their own message without interference from Plaintiffs, as long as Defendants otherwise comply with the law. As discussed in the sections below, Defendants sought to exercise these rights in compliance with prevailing law. Plaintiffs simply objected to *the message* that Defendants sought to send, as well as the *location* of the message.

That is, Plaintiffs' lawsuit is an attempt to silence Defendants from a particular type of speech in a location that Plaintiffs have no right to control. Plaintiffs' case seeks the pure content-based restriction that the First Amendment almost never allows. *See United States v. Alvarez*, 567 U.S. 709, 717, 132 S. Ct. 2537, 2544 (2012) ("content-based restrictions on speech have been permitted … only when confined to the few historic and traditional categories of

11

expression long familiar to the bar." (internal punctuation and citations omitted)); *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) ("The heckler's veto is … odious viewpoint discrimination" prohibited by the First Amendment).

Put succinctly, Plaintiffs' lawsuit asks the Court to impose a content-based restriction on Defendants' speech, and content-based speech restrictions can only stand if they meet the demands of strict scrutiny. *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 135 S. Ct. 2218 (2015). Plaintiffs' requested restriction cannot withstand that test, so their claim fails.

**D. The Signs Are Not "Compelled Speech"**

Plaintiff's First Amendment claim is premised on alleged "compelled speech." As discussed below, the compelled speech doctrine is not implicated because there is no legitimate basis to conclude that any Plaintiff is compelled to endorse the message on the Sheriff's sign.

**1. Overview of the Compelled Speech Doctrine**

The key dynamic in "compelled speech" cases is the government coercing a citizen personally to express a message to which the citizen objects. *See West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178 (1943) (government could not force student to recite pledge of allegiance or salute the flag); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428 (1977) (government could not punish motorist for covering up state motto on license plate); *Riley v. National Federation of Blind of N. C., Inc.,* 487 U.S. 781, 108 S.Ct. 2667 (1988) (state could not force charitable solicitors to utter certain disclosures in their solicitations); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1269 (11th Cir. 2004) (same as *Barnette*).

There are two core First Amendment concerns at the heart of the "compelled speech" doctrine. The first can be characterized as "freedom of thought," and it is not implicated here.[6]

---

[6]    *See Wooley*, 430 U.S at 714, 97 S. Ct. at 1435 ("The right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind;" also referencing "the right of freedom of thought protected by the First

The second is freedom from compulsion to utter or endorse an objectionable message. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 64–65, 126 S. Ct. 1297, 1310 (2006) (discussing compelled-speech precedents where "violations … result[ed] from interference with a speaker's desired message"); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557, 125 S. Ct. 2055, 2060 (2005) (describing "true 'compelled-speech' cases, in which an individual is obliged personally to express a message he disagrees with, imposed by the government"). These two concerns explain all of the Supreme Court's handful of "compelled speech" cases.

Plaintiffs do not claim that they are forced to utter an objectionable message. Rather, they claim that the signs give third parties the impression that Plaintiffs endorse the Sheriff's message. *Cf. Johanns*, 544 U.S. at 568, 125 S. Ct. at 2066 (Thomas, J., concurring) ("The government may not … associate individuals … involuntarily with speech by attributing an unwanted message to them … ."). For the reasons discussed below, there is no basis to conclude that any Plaintiff is compelled to endorse Sheriff Long's sign.

### 2. Precedent for Freedom Against Endorsing Objectionable Messages

Plaintiffs claim the signs are "compelled speech" because allegedly Plaintiffs would be forcibly associated with an objectionable message. There is very little binding precedent for this type of theory, and that precedent does not support Plaintiffs' case.

The most obvious compelled speech cases involve the government demanding a citizen affirmatively to endorse a message, like a requirement to salute the flag or recite the pledge of allegiance. *Holloman*, 370 F.3d at 1269. This case does not fit that category because the

---

Amendment"). This case does not implicate freedom of thought. The Sheriff's signs, no matter where they are placed, do not force any Plaintiff to believe anything at all. Nobody has asked, much less compelled, any Plaintiff personally to believe in the message on the sign. No Plaintiff is required to take any action regarding a sign. Plaintiffs are free to disagree.

Halloween signs do not require any Plaintiff to say or do anything. *See N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1566 (11th Cir. 1990) (rejecting compelled speech challenge to Alabama flag because "The government of Alabama does not compel its citizens to carry or post the flag themselves, or to support whatever cause it may represent.").

The most prominent precedent for a forced endorsement claim is *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428 (1977), where the Supreme Court ruled that the First Amendment protects citizens from being forced to communicate to third parties—recipients of the citizen's speech—the impression that the citizen endorses an objectionable message. Specifically, Mr. Maynard had a right against having to display the slogan "Live Free or Die" on his personal vehicles. *Wooley*, 430 U.S. at 715, 97 S. Ct. at 1435.

Neither the Supreme Court nor the Eleventh Circuit has articulated a specific test or set of elements for "compelled speech," much less a test for a claim that third parties will perceive a plaintiff to have endorsed an objectionable message. In *Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015), the Tenth Circuit adopted a four-part test that appears to encompass the basic elements of the Supreme Court's "compelled speech" precedent.[7] For a straightforward "compelled speech" claim (*e.g.*, a government mandate to say the pledge of allegiance), a plaintiff must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action. *Cressman*, 798 F.3d at 951.

Where the plaintiff claims that the government has impermissibly forced him to associate with an objectionable message, he must also prove a fourth element, namely that the government message "is readily associated with the plaintiff." *Cressman*, 798 F.3d at 949–51. A basic test for this "ready association" element asks whether the plaintiff is " 'closely linked with the expression in a way that makes [him] appear to *endorse* the government's message.' "

---

[7] Like *Wooley*, *Cressman* involved a challenge to a state license plate.

*Cressman*, 798 F.3d at 949 (emphasis in original; quoting *Johanns v. Livestock Marketing Association,* 544 U.S. 550, 565 n. 8, 125 S.Ct. 2055 (2005)).[8]

There is no dispute about the first two elements because the signs amount to speech to which Plaintiffs object. However, as discussed below, Plaintiffs' compelled speech claim falters on the third and fourth elements.

### 3. Application of the "Compelled Speech" Elements

#### a. The Signs Do Not Compel Plaintiffs to Send a Message

As noted above, a compelled speech claim requires a credible showing that the government is forcing the plaintiff to send a message. "In order to compel the exercise ... of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.' " *Phelan v. Laramie County Community College Bd. of Trustees*, 235 F.3d 1243, 1244–47 (10th Cir.2000) (quoting *Laird v. Tatum*, 408 U.S. 1, 11, 92 S.Ct. 2318 (1972)); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 565, 125 S. Ct. 2055, 2065 (2005) (rejecting compelled speech claim "Since neither the Beef Act nor the Beef Order require[d] attribution" to plaintiffs).

Here, it would be error to equate standard legal protections of government property with coercion. The Sheriff's Office intended to place signs on public rights-of-way, and Plaintiffs were prohibited from interfering with signs that (a) do not belong to Plaintiffs and (b) are not on Plaintiffs' property. There has never been a plan to compel a Plaintiff to display a sign.

In the injunction order, the Court emphasized its belief that Plaintiffs allegedly *could not display competing messages*. The apparent evidentiary basis for this idea is that (1) Plaintiffs would be prohibited from moving or defacing Sheriff's Office signs, and (2) Sheriff Long's

---

[8] In *Johanns,* the Supreme Court rejected a compelled speech claim where the law in question did not "require[] attribution" of an advertising message to the plaintiffs. *Johanns,* 544 U.S. at 565, 125 S.Ct. at 2065.

answer to the following question:

> Q.    And could a registrant have placed a sign next to yours that says,
>
> "disregard and come on and trick-or-treat"?
>
> A.    No.

Doc. 20 (transcript) at 47.

As to interference with signs, of course Plaintiffs are prohibited from interfering with government property that is lawfully posted on government right-of-way. That is simply a matter of Georgia criminal law. O.C.G.A. § 16-7-24 (a) ("A person commits the offense of interference with government property when he destroys, damages, or defaces government property… ."); O.C.G.A. § 16–7–21 (criminal trespass to "intentionally damage[] any property of another without consent of that other person … or knowingly and maliciously interfere[] with the possession or use of the property of another person without consent of that person."). A sign does not lose its legal protection simply because someone objects to a message on the sign. That basic legal protection is not "coercion," and it lends no support to Plaintiffs' First Amendment challenge.

In regard to Sheriff Long's testimony above, it requires more discussion. As detailed next, Sheriff Long's unelaborated denial that Plaintiffs could place their own signs "next to" his has no relevance to the First Amendment claim pleaded in the Amended Complaint.

### b.   The Sheriff's Office Does Not Have a Policy or Practice Prohibiting Lawful Speech by Any Plaintiff

The Butts County Sheriff's Office has no policy or practice to prohibit any Plaintiff's lawful expression on private property. For several reasons, Sheriff Long's denial that Plaintiffs could place their own signs "next to" his, see Doc. 20 (transcript) at 47, does not legitimately support anything of consequence to this case. First, the question was purely hypothetical. No

16

Plaintiff ever tried to put up his own sign or wanted to, and the Sheriff's Office never responded to that type of situation.

If such an issue had arisen, and if Sheriff Long was concerned enough to consider action, then the Sheriff's Office would have sought legal counsel—just as it did when considering whether to post Halloween signs. *See* Doc. 20 (transcript) at 39-41. One legal consideration would be that a Plaintiff has no legal right to post his own sign *next to* the Sheriff's sign on government right-of-way.[9] *Cf.* Doc. 20 (transcript) at 47 ("could a registrant have placed a sign next to yours …?"). If placed next to Sheriff Long's sign, then the registrant's sign would illegally be on government right-of-way, regardless of any message on the hypothetical sign. That is why Sheriff Long indicated his belief that no such sign could be placed "next to" his. Declaration of Sheriff Long at ¶6. It is a matter of law rather than a matter of censorship.

Second, Sheriff Long was not articulating a policy when he answered the question. He simply was trying to cooperate, and he gave his personal opinion about a hypothetical situation that never occurred. In fact there is no policy, and the situation never arose. Declaration of Sheriff Long at ¶4.

Aside from the foregoing, there are serious substantive flaws with any reliance upon the idea that the Sheriff's Office prohibited any Plaintiff from posting a sign. Those flaws are considered next.

---

[9]    *See* O.C.G.A. § 32-6-51(a) (prohibiting placement of most items on rights-of-way); *Crider v. Kelley*, 232 Ga. 616, 619, 208 S.E.2d 444, 446 (1974) ("The management and control of the right-of-way of the state's system of roads is vested in the Dept. of Transportation. Likewise, the control of the right-of-way of streets within a municipality not on the state system is vested in the governing body of the municipality. *Without doubt either could require the removal of any obstruction placed thereon without express permission*." (emphasis supplied; citation omitted)).

### c. Plaintiffs Raised a Challenge Only to Signs, Not a Challenge to an Alleged Sheriff's Office Prohibition on Plaintiffs' Own Expression

The Amended Complaint challenges placement of the Sheriff's Halloween signs on the basis of a "compelled speech" theory. There is no claim about an alleged Sheriff's Office prohibition on *Plaintiffs' own* signs or messages, and it would be error to entertain such a claim. *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (refusing to entertain claim not raised in response to motion but not in complaint). At any rate, there was no such prohibition, and there was never an issue about a Plaintiff being prohibited from posting his own sign on private property.

### d. The Signs Do Not Squelch Competing Messages

It is an analytical mistake to confuse a claim about *Sheriff's Office signs* with some supposed Sheriff's Office *prohibition on speech*. Government speech (*i.e.* the message on a sign) is very different from government censorship of private speech, and each raises its own distinct First Amendment questions.

If a claimant proves that a Sheriff's Office policy violates the First Amendment due to unlawful censorship of protected speech, then the claimant is entitled to an injunction *against that particular policy*. That type of challenge should be framed as a claim against "a content-based restriction on speech." *See Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1266 (11th Cir. 2005) (First Amendment challenge to sign ordinance). The Amended Complaint does not raise that type of claim. Even if such a claim was at issue, it would not follow that the Sheriff's *own signs*—which obviously are distinct from any response to any Plaintiff's hypothetical speech—amount to "compelled speech" prohibited by the First Amendment.

There is no basis (in the pleadings or the record) to consider a content-based restriction on any Plaintiff's speech. At any rate, that type of issue is irrelevant to Plaintiffs' "compelled

speech" claim.

### e. Plaintiffs Were Not Compelled to Endorse the Signs

To sum up, Defendants did not compel any Plaintiff to endorse Sheriff Long's message. The record supports only that Plaintiffs were prohibited from interfering with the signs, which is only to say that the signs have the same protection as any other piece of government property. That is far different from compelling any Plaintiff to endorse a message. Lack of compulsion is fatal to Plaintiffs' "compelled speech" claim.

Beyond that fatal flaw, Plaintiffs' compelled speech claim also fails because nobody is likely to get the impression that Plaintiffs endorse the Sheriff's message. That equally fatal deficiency is considered next.

### 4. The Signs Are Not Readily Associated with Plaintiffs in Any Sense that Infringes Their First Amendment Rights

The test for compelled endorsement of an objectionable message asks in part whether the speech is "readily associated with" the plaintiff. That inquiry looks to whether the plaintiff "is 'closely linked with the expression in a way that makes [him] appear to *endorse* the government's message.' " *Cressman v. Thompson*, 798 F.3d 938, 949 (10th Cir. 2015) (emphasis in original). As discussed below, proper application of that test verifies that Plaintiffs have no "compelled speech" claim.

### a. Alleged Association With a Message is Measured Against Reasonable Third Party Perception

Critically for the present case, the First Amendment concern about perceived endorsement is only triggered when a third party can believe reasonably that the plaintiff endorses the objectionable message. *Cf. Wooley*, 430 U.S. at 717, 97 S. Ct. at 1436 (describing motorist's "First Amendment right to avoid becoming the courier for [the state's] message", and

noting that "As a condition to driving an automobile a virtual necessity for most Americans the Maynards must display "Live Free or Die" to hundreds of people each day."). For example, the license plate slogan in *Wooley* was readily associated with the plaintiff because the state required its display on his personal vehicle and by necessity he had to drive the vehicle publicly. By contrast, the signs in this case are not "readily associated with" any Plaintiff because no third party reasonably can draw a conclusion that a Plaintiff endorses the message on the sign.

The Supreme Court's precedent teaches that where reasonable third parties are unlikely to regard the plaintiff as having endorsed the objectionable message, the First Amendment is not implicated. Put differently, Plaintiffs' First Amendment claim is only viable if a third party reasonably could conclude that a message adjacent to a Plaintiff's residence, and occasioned by the Plaintiff's sex offender status, is thereby endorsed by the Plaintiff. Under binding precedent, Plaintiffs cannot make that case.

For example, in *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035 (1980), the Supreme Court upheld a law requiring a shopping center owner to allow certain expressive activities by others on its property. Relying upon *Wooley*, the plaintiff made the same basic argument that the Plaintiffs make here: it claimed that "a private property owner has a First Amendment right not to be forced by the State to use his property as a forum for the speech of others." *Robins*, 447 U.S. 74, 85, 100 S. Ct. at 2043. Plaintiffs' claim in the present case varies only slightly (and is weaker), in that they claim a right against a clearly government message placed in the government right-of-way adjacent to their residences.

*Robins* rejected the First Amendment compelled speech argument, under the rationale "that there was little likelihood that the views of those engaging in the expressive activities would be identified with the owner, who remained free to disassociate himself from those views and who was 'not ... being compelled to affirm [a] belief in any governmentally prescribed

20

position or view.' " *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65, 126 S. Ct. 1297, 1310 (2006) (quoting *Robins*, 447 U.S. at 88, 100 S.Ct. 2035). The same is true here, where the signs unambiguously ascribe the message to Sheriff Long, and Plaintiffs remain free to disassociate themselves from the signs.

Similarly, in *Rumsfeld*, *supra*, an association of schools complained of "compelled speech" due to a law that required them to allow military recruiters the same access as non-military recruiters. *Rumsfeld*, 547 U.S. at 52, 126 S. Ct. at 1302. The Court rejected the compelled speech argument because "Nothing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the [relevant law] restricts what the law schools may say about the military's policies." *Rumsfeld*, 547 U.S. at 65, 126 S. Ct. at 1310. Likewise, in the present case nothing about the Sheriff's sign suggests that any Plaintiff agrees with the message on the sign, and nothing on the sign restricts what a Plaintiff may say. As discussed further below, the location of a sign adjacent to a Plaintiff's residence does not change those facts.

**b.   Nobody Reasonably Can Conclude that Plaintiffs Endorse the Message on the Sign**

As established above, a Plaintiff's freedom from personal association with objectionable government messages is only at issue when a third party *can believe reasonably that plaintiff endorses the objectionable message. Cressman*'s "readily associated with" test gets at that by asking whether the plaintiff was " 'closely linked with the expression in a way that makes [him] appear to *endorse* the government's message.' " *Cressman*, 798 F.3d at 949 (emphasis in original).

Here, one need only read the sign to see that Plaintiffs' claim fails the endorsement test. The sign clearly identifies itself as "a community safety message from Butts County Sheriff Gary

21

Long." Doc. 12-11. There is not the slightest hint that any sex offender endorses the sign. No reasonable person can read the sign and conclude that any Plaintiff created, agrees with, or otherwise endorses the sign. The sign's proximity to any given house does not make an endorser out of the occupant(s), any more than a speed limit sign, a condemnation notice, or an orange safety cone would.

While the opinions or beliefs of passers-by are not in the record, even widespread public ignorance about the government's control, and Plaintiffs' lack of control, over rights-of-way does not justify a finding that *reasonable* third parties are likely to attribute these signs to Plaintiffs. Reasonable third parties are presumed to know the law, and will read that the signs bear a message from Sheriff Long.

One last point puts the endorsement issue to rest. At the hearing Plaintiffs' counsel highlighted that, even though the signs bear no reference to sex offenders, Sheriff Long intended the public to know that the signs warn about sex offenders. Doc. 20 (transcript) at 57. Yet that is one of the strongest testaments that no third party reasonably can conclude that Plaintiffs endorse the signs. No reasonable person would believe that a sex offender would put a sign outside his residence that tends to broadcast his sex offender status. That alone is ample reason to conclude that no reasonable person could believe that any Plaintiff is "closely linked with the [sign] in a way that makes [him] appear to *endorse* the … message" on the sign. *See Cressman*, 798 F.3d at 949 (emphasis in original).

### c.  Application of the "Ready Association" Test

The Court previously concluded that the signs are "associated with" the sex offender who lives at the house near the sign. That is true, but only in the irrelevant sense that signs are placed to warn about the sex offender who lives there. As discussed below, that type of "association"

does not matter in a First Amendment compelled endorsement claim. A message alerting the public to the presence of a sex offender is not evidence that the sex offender endorses the message, particularly where the message is plainly labeled as the message of Sheriff Long.

When courts properly consider whether allegedly compelled speech is "readily associated with" a plaintiff, they are *not* asking merely whether the message is *about* the plaintiff. It does not matter whether the message *relates to* the plaintiff, or *references* the plaintiff. None of that helps determine whether the message is "compelled speech." [10]

Notably, *every* government communication identifying a sex offender as such—whether posted on the internet, in a government building, or on a sign near the sex offender's residence—is "readily associated with" the sex offender, in the way that a "wanted" poster is "readily associated with" the wanted fugitive. Yet no reasonable third party is likely to conclude that sex offenders endorse the government communications identifying them as such.

This observation highlights a key error in *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310 (M.D. Ala. 2019). *Marshall* struck down the part of an Alabama law that "branded" sex offender "driver's license[s] … with "CRIMINAL SEX OFFENDER" in bold, red letters." *Id.* at 1318. [11] The law required offenders to "obtain ... and always have in [their] possession, a valid driver license or identification card" with that label. *Marshall*, 367 F. Supp. 3d at 1321 (quoting

---

[10]    This is so even though—due to imprecise use of language—a message merely *referencing* or *relating to* a plaintiff can be said to be "readily associated with" that plaintiff. A judgment with a prison sentence may be said to be "readily associated with" the convict, but nobody can argue that the sentencing judge is forcing the convict to endorse "compelled speech." A "wanted" poster about a fugitive is associated with the fugitive, but it does not follow that the fugitive endorses the message. Likewise, a message *about* a plaintiff does not thereby give the impression that the plaintiff *endorses that message* for First Amendment purposes.

[11]    Whether *Marshall* reached the right overall conclusion is debatable, but that is beside the point for purposes of this discussion because *Marshall* presents a very different set of facts. *Marshall* was never appealed.

statute).[12]

    *Marshall*'s analysis on the "ready association" element reflects confusion about what "ready association" means in the First Amendment compelled speech context. *Marshall* misapplied the Tenth Circuit's "ready association" test, which asks whether the plaintiff was "'closely linked with the expression in a way that makes [him] appear to *endorse* the government's message.'" *Cressman v. Thompson*, 798 F.3d 938, 949 (10th Cir. 2015) (emphasis in original). Instead of testing for endorsement, *Marshall* asked only whether the labelling on the driver's license was *about the sex offender plaintiffs*:

> The words "CRIMINAL SEX OFFENDER" are *about* Plaintiffs. The ID cards are chock-full of Plaintiffs' personal information: their full name, photograph, date of birth, home address, sex, height, weight, hair color, eye color, and signature. Just as George Maynard was associated with his stationwagon, Plaintiffs are associated with their licenses. When people see the brand on Plaintiffs' IDs, they associate it with Plaintiffs. The dirty looks that Plaintiffs get are not directed at the State.

*Marshall*, 367 F. Supp. 3d at 1326 (emphasis in original).

    Simply put, *Marshall* never considered whether a reasonable person would conclude that the sex offenders *endorsed* the "criminal sex offender" messages on their licenses. Rather, *Marshall* literally only asked whether the "criminal sex offender" message was "*about* plaintiffs." *Id*. at 1326. By contrast, the whole point of *Cressman*'s "ready association" test is whether a third party reasonably can view the plaintiff as having *endorsed* the offensive message. *Marshall* completely misses that point.

    The driver license labelling in *Marshall* is also distinguishable from this case because here the message is clearly presented as coming from Sheriff Long. In sum, there is no basis to

---

[12] One of the many factual distinctions between this case and *Marshall* is that the Alabama sex offenders were required to pay for, obtain and present their driver's licenses—bearing the sex offender message—regularly to third parties. Driving and presenting a photo ID is a condition of ordinary life in this society, and the Alabama sex offenders faced presenting the challenged message on a day-to-day basis for a lifetime. Also, there was no indication on the Alabama drivers licenses that the label was a government message.

find third party perception of endorsement for the signs. Beside that, Plaintiffs were always free to disassociate themselves from Sheriff Long's message. Because no third party reasonably could conclude that any Plaintiff endorses the message on Sheriff Long's sign, Plaintiffs cannot sustain a "compelled speech" claim.

### 5.    The Signs Withstand First Amendment Scrutiny

In a pure "compelled speech" case involving ideological speech, like *Barnette* or *Wooly*, it appears that "strict scrutiny" applies. By contrast, Defendants submit that the message at issue is not ideological. Rather, it is a public safety warning by Sheriff Long, clearly labeled as such.

The warning on the sign is more like a product safety label than an ideological slogan. Government-created product safety labeling is reviewed for whether "there is a rational connection between the warnings' purpose and the means used to achieve that purpose." *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 561 (6th Cir. 2012) (holding that textual and graphic warnings required for advertising were reviewed under rational basis scrutiny); *see also Johanns v. Livestock Marketing Assn.,* 544 U.S. 550, 560–562, 125 S.Ct. 2055 (2005) (applying lower scrutiny when the challenged speech is made by the government).

Because the law is unclear about the proper level of scrutiny, both levels are considered below. Before that, however, Defendants discuss the seemingly undisputed point that protecting the public from sex offenders is a compelling government interest.

### a.    Protecting the Public from Sex Offenders is a Compelling Government Interest

The Court previously found, and Defendants agree, that the signs tend to further a compelling government interest, namely protecting the public from sex offenders. That interest is furthered by warning the public and particularly children.

Both Congress and the Georgia General Assembly have declared strong public policies in

warning and protecting the public—and particularly children—from sexual offenders. Congress adopted the Sex Offender Registration and Notification Act (SORNA), under the following policy:

> In order to protect the public from sex offenders and offenders against children, and in response to the vicious attacks by violent predators against the victims listed below, Congress in this chapter establishes a comprehensive national system for the registration of those offenders.

34 U.S.C.A. § 20901. That statute then lists 17 child victims from across the country.

Likewise, Georgia's sex offender registration laws advance "the State's legitimate goal of informing the public for purposes of protecting children from those who would harm them." *Rainer v. State*, 286 Ga. 675, 678, 690 S.E.2d 827, 829 (2010).[13] That is precisely what the signs in question are designed to do.

O.C.G.A. § 42-1-12 (i)(5) requires sheriffs to "Inform the public of the presence of sexual offenders in each community." That is the purpose of the Halloween signs. O.C.G.A. § 42-1-12 (j)(3) requires sheriffs to "release such other relevant information collected under this Code section that is necessary to protect the public concerning sexual offenders required to register under this Code section … ."  By warning children away from sex offenders, the Sheriff's Office is fulfilling its mandate to protect the public—and particularly children—from sex offenders.

Plaintiffs are likely to minimize the risk posed at Halloween by sex offenders as a class. However, three points establish that the signs serve an important role. First, both federal and state governments have recognized that sex offenders as a class pose enough of a recidivism risk

---

[13] "By requiring sex offenders to register, the legislature intended to notify the public of individuals who may pose a threat. *Spivey v. State,* 274 Ga.App. 834, 837, 619 S.E.2d 346 (2005). It also intended the sex offender registry statute to have broad applicability by "design[ing] [the statute] to require registration for a wide array of offenses." *Id*. at 835, 619 S.E.2d 346 (perpetrator caught in a sting and convicted of attempted child molestation was required to comply with the sex offender registry statute)."  *Jenkins v. State*, 284 Ga. 642, 645, 670 S.E.2d 425, 428 (2008).

to justify elaborate registration, tracking and warning systems. The risk evaluation drawn by informed legislatures across the United States is entitled to controlling deference.

Second, lack of information about past sex offender violations against trick-or-treating children in Butts County may simply be a testament to law enforcement protection and mitigation efforts in prior years. It may also be a function of the fact that not all crimes are reported, which results in understated crime statistics.

Third, nobody can predict the future, and sex offenders as a group have demonstrated a statistically significant risk of victimizing other people sexually. That is why the sex offender registration laws exist. The Sheriff's Office would be irresponsible to fail to mitigate a known risk merely for lack of information that the risk has materialized in Butts County in the recent past. Moreover, even a low risk of victimization is well worth elimination when the crimes of sex offenders often are horrific and destroy the lives of their innocent victims.

**b.    The Signs Pass Rational Basis Scrutiny**

Rational basis scrutiny in the compelled disclosure context measures whether the "disclosure requirements are reasonably related to the State's interest… ." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651, 105 S. Ct. 2265, 2282, (1985). This requires "a fit between the … ends and the means chosen to accomplish those ends —a fit that is not necessarily perfect, but reasonable." *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028 (1989).

Here, the signs directly further the government interest of warning the public about the location of sex offenders. The signs tell the public exactly where sex offenders reside at a time when the likelihood of public exposure to sex offenders at sex offender residences is high. This allows members of the public to take appropriate precautions. Plainly the signs pass "rational basis" scrutiny.

### c.    The Signs Pass Strict Scrutiny

The Court's previous order suggested that the signs fail strict scrutiny because other means exist to warn the public about sex offenders, without infringing Plaintiffs' First Amendment rights. By this the Court apparently meant that "Halloween on the Square" was an option in 2019, as it was in 2017 and years before that. Doc. 17 at 19. The record, however, established that Sheriff Long had no control over "Halloween on the Square," which was discontinued after 2017 by local businesses rather than the Sheriff's Office. Doc. 20 (transcript) at 38-39. Otherwise the Court cited Facebook posts, which simply referenced "Halloween on the Square" and Sheriff Long posting signs. Doc. 12-2; 12-8.

Strict scrutiny asks whether the signs are "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 135 S. Ct. 2218 (2015). The evidence is that the signs are quite temporary, intended to be present for up to three days, including Halloween. The signs are conspicuous enough to be read, but not nearly as conspicuous as a police vehicle or a deputy in front of a house sending the same message as a sign. The signs do not bear the term "sex offender."  The signs do not burden any Plaintiff's speech, or require any Plaintiff to endorse the message. No Plaintiff is required to do, or say, anything.

A sign in the right-of-way in front of a sex offender residence is a simple, efficient, effective way to alert trick-or-treating children and their parents to avoid direct contact with sex offenders. No literate person, young or old, needs sophistication, internet access, or computer skills to read and heed a sign.

The signs alleviate the need for an already busy citizen to undertake the time-consuming task of working through a lengthy list of sex offender names and addresses, and then correlating addresses with real structures to avoid. Not everyone has the time, resources or capability competently to compile a list of residences to avoid for trick-or-treating. The signs are temporary

28

warnings, narrowly tailored to achieve what everyone acknowledges is a compelling government interest. Therefore, the signs pass "strict scrutiny."

## IV.    PLAINTIFFS CANNOT PREVAIL ON A FEDERAL TAKING CLAIM

Plaintiffs plead that placement of a sign in a yard for less than a week triggers a federal "taking." As discussed in prior sections, Eleventh Amendment immunity and qualified immunity bar this claim. Beyond immunities, temporary, *de minimis* placement of a sign does not support a "taking" claim. Plaintiffs Reed and McClendon have no real estate to take, so they have no standing to sue for a taking. Plaintiff Holden claims the sign was his yard, but the evidence shows the signs were on government right of way, so no Plaintiff can establish a federal taking claim. *Moses v. Traton Corp.*, 286 Ga. App. 843, 844, 650 S.E.2d 353, 355 (2007) (party had no trespass claim where damaged property was government right-of-way).

Aside from that, there is no federal taking claim because Georgia law provides an adequate remedy where a genuine taking occurs.

The Fifth Amendment to the United States Constitution precludes the taking of private property for public use without just compensation. If a state provides an adequate procedure for seeking just compensation, a property owner cannot assert a claim under the Just Compensation Clause until it has used the state procedure and has been denied just compensation. [FN1: *Williamson County Regional Planning Comm. v. Hamilton Bank,* 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).] Georgia law provides a procedure for obtaining compensation for the inverse condemnation of one's property.

*Benton v. Savannah Airport Comm'n*, 241 Ga. App. 536, 538, 525 S.E.2d 383, 386 (1999). Therefore, no Plaintiff has a viable federal Fifth Amendment claim.

## V.    OFFICIAL IMMUNITY BARS PLAINTIFFS' STATE TORT CLAIMS, WHICH ALSO FAIL ON THE MERITS

### A.  Official Immunity

Plaintiffs assert trespass claims under state law. "[U]nder the Georgia Constitution, state officials are entitled to official immunity for their discretionary actions unless they acted with

"actual malice" or an "actual intent to cause injury." *Black v. Wigington*, 811 F.3d 1259, 1265–66 (11th Cir. 2016) (quoting Ga. Const. art. I, § 2, ¶ IX(d)). Defendants' decisions about, and involvement in warning the public about sex offenders is discretionary since it involves exercise of discretion. *Cf. Butler v. Carlisle*, 299 Ga. App. 815, 821, 683 S.E.2d 882, 888 (2009) (holding that sheriff had to exercise discretion relating to traffic control plan), *disapproved on other ground*, *Mercer Univ. v. Stofer*, 306 Ga. 191, 830 S.E.2d 169 (2019).

     Therefore, to overcome official immunity Plaintiffs have to show "actual malice."

> Actual malice is a demanding standard: it requires an officer to act with a deliberate intention to do a wrongful act. True, a jury can infer actual malice based on an officer's conduct. But unreasonable conduct does not support such an inference. Even recklessly illegal conduct does not support an inference of actual malice.

*Black,* 811 F.3d at 1266 (citations and internal punctuation omitted).

     Here, the record reveals that Sheriff Long decided to warn the public by placing the signs, and Deputies Riley and Crumley placed the signs in rights of way. None of this qualifies for actual malice. Defendants were not engaged in clearly illegal acts designed solely to harm Plaintiffs' property interests, which are the only interests implicated under state law. Therefore, official immunity bars Plaintiffs' state law claims.

**B. Plaintiffs Lack Standing to Sue For Claims Relating to Property Interests**

     Plaintiffs McClendon and Reed do not claim to own real property, so they lack standing in regard to any claim relating to real property interests. Doc. 5 at ¶¶16, 33 (parent(s) own property, not Reed or McClendon). Indeed, no Plaintiff has standing to pursue or enjoin a "trespass" because the signs were, and will be, posted on public right-of-ways.

     In this regard *Moses v. Traton Corp.*, 286 Ga. App. 843, 844, 650 S.E.2d 353, 355 (2007), is instructive. The plaintiff was a subdivision homeowner who sued for trespass after trucks left ruts in "his" front yard, near the curb. *Id.* at 843. However, the ruts were in the public

right-of-way that ran across his front yard, so the Court of Appeals affirmed dismissal for lack of

standing.

> Moses has not demonstrated legal possession because the subject property is, as he concedes, a public right of way owned by Cobb County. While Moses may use the right of way in the same manner as other members of the public, his interest in such property is not one whereby he may assert that he possesses the land to the exclusion of others. Therefore, the trial court correctly ruled that Moses's asserted possessory interest did not provide a basis to demonstrate standing to sue for trespass.

*Moses v. Traton Corp.*, 286 Ga. App. 843, 844, 650 S.E.2d 353, 355 (2007).

The same result is required here, where signs—far less intrusive than tire ruts—were

simply placed on public right-of-way rather than on any Plaintiff's property.

## VI.   SOVEREIGN IMMUNITY BARS STATE CLAIMS AGAINST DEFENDANTS SUED IN AN OFFICIAL CAPACITY

Sovereign immunity protects Georgia sheriffs from liability for money damages and non-

monetary relief, in the absence of a statutory waiver. Ga. Const. of 1983, Art. I, Sec. 2, Pars. 9

(d) & (e); *Lathrop v. Deal*, 301 Ga. 408, 409, 801 S.E.2d 867, 869 (2017). Notably, suing a

Defendant in an "official capacity" is the equivalent of suing the Sheriff's Office as an entity.

*Gilbert v. Richardson*, 264 Ga. 744, 746(2), n. 4, 452 S.E.2d 476 (1994); *Ratliff v. McDonald*,

326 Ga. App. 306, 309, 756 S.E.2d 569, 573 (2014); *Glass v. Gates*, 311 Ga. App. 563, 567 n. 3,

716 S.E.2d 611, 616 (2011), *aff'd* 291 Ga. 350, 729 S.E.2d 361 (2012).

Unless Plaintiffs can prove a waiver, sovereign immunity bars all relief under state law.

Ga. Const. of 1983, Art. I, Sec. 2, Pars. 9 (d) & (e); *Board of Regents of Univ. System of Ga. v.*

*Daniels*, 264 Ga. 328, 446 S.E.2d 735 (1994). There is no waiver for the state law claim(s) in this

case, so sovereign immunity bars any relief under state law. *See Georgia Dep't of Nat. Res. v.*

*Ctr. for a Sustainable Coast, Inc.,* 294 Ga. 593, 602, 755 S.E.2d 184, 191 (2014) (sovereign

immunity bars injunctive relief); *GeorgiaCarry.Org, Inc. v. Bordeaux*, 352 Ga. App. 399, 403,

834 S.E.2d 896, 900 (2019) (holding that sovereign immunity bars declaratory relief).

## CONCLUSION

For each of the foregoing reasons, Defendants respectfully submit that they are entitled to summary judgment.

Respectfully submitted,

WILLIAMS, MORRIS & WAYMIRE, LLC

/s/ Jason C. Waymire
TERRY E. WILLIAMS
Georgia Bar No. 764330
JASON C. WAYMIRE
Georgia Bar No. 742602
Attorney for Defendants

Building 400, Suite A
4330 South Lee Street, NE
Buford, Georgia 30518
(678) 541-0790
(678) 541-0789
jason@wmwlaw.com